## Richmond

## SOUTHEASTERN TIDEWATER AREA MANPOWER AUTHORITY AND NORTH RIVER INSURANCE COMPANY

### v.

## LYDIA COLEY

March 6, 1981.

Record No. 800384.

Present: Carrico, C.J., Harrison, Cochran, Poff, Compton, and Thompson, JJ.*

---

\* Mr. Chief Justice I'Anson presided at the oral argument of this case but retired on January 31, 1981.

*Frank B. Miller, III (Albert D. Bugg, Jr.; Sands, Anderson, Marks & Miller,* on brief), for appellants.

*(James Carney Hawks; Hawks & Hawks,* on brief), for appellee. No argument for appellee.

*Amicus Curiae; Karen A. Gould, Assistant Attorney General (Marshall Coleman, Attorney General; Walter H. Ryland, Chief Deputy Attorney General,* on brief), for Uninsured Employer's Fund.

HARRISON, J., delivered the opinion of the Court.

Lydia Coley sustained an accidental injury which arose out of and in the course of her employment by the Chesapeake Community Action Service Organization (Chesapeake). Chesapeake was not insured under any policy of workmen's compensation insurance and did not qualify as a self-insured. The issue here is whether Coley was also the statutory employee of Southeastern Tidewater Area Manpower Authority (Tidewater) by virtue of Code § 65.1-29.

Tidewater represents a cooperative undertaking between the Cities of Chesapeake, Franklin, Norfolk, Portsmouth, Suffolk, and Virginia Beach and the Counties of Isle of Wight and Southampton. The venture was created pursuant to Code § 15.1-21 and is evidenced by charter agreement dated July 1, 1974. The parties stipulated that Tidewater was established for the purpose of "funneling Federal funds" to various organizations in accordance with the provisions of the Comprehensive Employment Training Act of 1973 (CETA).

Chesapeake was a nonprofit organization providing reading skills and voter registration assistance to citizens of the City of Chesapeake. Tidewater disbursed CETA funds to Chesapeake and to numerous other organizations operating in the six-city, two-county territory. Disbursements to Chesapeake were made pursuant to an agreement between it and Tidewater, executed on December 15, 1977. In the agreement, Tidewater is designated as a "Prime Sponsor" and Chesapeake as a "Program Agent" or "Program Operator." The agreement set forth that Tidewater expected to receive federal funds provided by CETA and desired to contract for "the public service employment activities" of Chesapeake for the period ending September 30, 1978. Chesapeake agreed to provide Tidewater a plan for the public service employment programs administered by it, to render monthly progress reports as to the funds disbursed, and to furnish other data pertaining to the operation of the programs. Additionally, Chesapeake was required to demonstrate to Tidewater its ability to conduct its

public service employment programs. The agreement provided that Chesapeake was to obtain written permission from Tidewater before subcontracting any public employment service activities and that Tidewater should be deemed an approved subcontractor of Chesapeake for the purpose of funds budgeted to Chesapeake.

The principal function of Tidewater was to receive CETA funds, determine if the programs advanced by Chesapeake and other applicants qualified for funding, disburse the funds, and monitor the financed programs for compliance with CETA requirements. Chesapeake was charged with the responsibility of hiring and firing its personnel, paying salaries, determining which individuals were to receive instruction, and otherwise conducting the programs at the local level. No employee of Tidewater instructed any person on reading skills or voter registration. This was the sole responsibility of Chesapeake.

The day-to-day activities incident to the programs being sponsored by Chesapeake were the sole responsibility of Chesapeake. The fact that Tidewater was charged with the duty to monitor the programs and oversee the performance by Chesapeake did not create any master-servant relationship between Tidewater and Chesapeake or between Tidewater and the employees of Chesapeake. Neither did the failure of Chesapeake to provide workmen's compensation insurance, as it assured Tidewater it would do in their agreement, alter the relationship between the parties. The most that can be said in this respect is that Tidewater may have been derelict in not determining from the records of Chesapeake that such insurance had not been purchased.

Significantly here, Tidewater and Coley expressly stipulated that there was no master-servant relationship by and between Coley and Tidewater and that the employees of Chesapeake were not engaged in the trade, business, or occupation of Tidewater. We do not agree with the Industrial Commission that this stipulation of fact may be disregarded. The dispositive issue in this case is whether Coley, an employee of Chesapeake, was also engaged in Tidewater's trade or business so as to entitle her to the status of a statutory employee. The parties freely and in good faith stipulated that the employees of Chesapeake were not so engaged. This court has repeatedly said that admissions and stipulations made in good faith should be encouraged and that a party should not be permitted to assert at trial a contention which is contrary to a stipulation to which that party, by counsel or otherwise, has freely and in good faith agreed. *See McLaughlin* v. *Gholson*, 210 Va. 498, 171 S.E.2d 816 (1970); *Dooley* v. *Commonwealth*, 198 Va. 32, 92 S.E.2d 348 (1956); *Burke* v.

*Gayle,* 193 Va. 130, 67 S.E.2d 917 (1951); *Harris* v. *Diamond Const. Co.,* 184 Va. 711, 36 S.E.2d 573 (1946).

Code § 65.1-29 provides:

> **Liability of owner to workmen of subcontractors.**—When any person (in this section and §§ 65.1-31 and 65.1-32 referred to as "owner") undertakes to perform or execute any work which is a part of his trade, business or occupation and contracts with any other person (in this section and §§ 65.1-31 to 65.1-34 referred to as "subcontractor") for the execution or performance by or under such subcontractor of the whole or any part of the work undertaken by such owner, the owner shall be liable to pay to any workman employed in the work any compensation under this Act which he would have been liable to pay if the workman had been immediately employed by him. (Code 1950, § 65-26; 1968, c. 660.)

The purpose of this section is to bring within the operation of the Workmen's Compensation Act all persons engaged in any work that is a part of the trade, business, or occupation of the "owner" which is customarily done by the owner's employees. In *Shell Oil Co.* v. *Leftwich,* 212 Va. 715, 187 S.E.2d 162 (1972), we cited with approval 1C A. Larson, *The Law of Workmen's Compensation* § 49.12 at 9-53 (1980), and set forth the following test for a statutory employee:

> "[T]he test is not one of whether the subcontractor's activity is useful, necessary, or even absolutely indispensable to the statutory employer's business, since, after all, this could be said of practically any repair, construction or transportation service. The test (except in cases where the work is obviously a subcontracted fraction of a main contract) is whether this indispensable activity is, in that business, *normally* carried on through employees rather than independent contractors." (Emphasis supplied.)

212 Va. at 722, 187 S.E.2d at 167. *See also Bassett Furniture* v. *McReynolds,* 216 Va. 897, 224 S.E.2d 323 (1976).

It is clear that the six cities and two counties formed a consortium to facilitate the acquisition of federal funds. This consortium was a conduit through which CETA funds were funneled from the federal government to the localities. The funds were obtained, dis-

bursed, and monitored by Tidewater. However, the funds were utilized by the local organizations in the management of their programs.

Admittedly, programs similar to those sponsored by Chesapeake were indispensable to carry out the purposes for which Tidewater was organized. However, the administration of the programs, the selection of the individuals to participate therein, the selection of instructors and employees to service the programs, and the salaries, grants, and allowances to be paid were all activities which Tidewater did not normally carry on through its employees and which it was not designed to carry on. These were Chesapeake's responsibility and constituted its function. Tidewater procured the funds, and Chesapeake provided the manpower training services. Each acted through its own employees, and at no time did Chesapeake perform work which normally was performed by Tidewater.

Consistent with the stipulation of the parties, which is supported by the evidence, we hold that Coley was not a statutory employee of Tidewater. Accordingly, the award of the Commission is reversed, and the application of the appellee is dismissed.

*Reversed and dismissed.*