## CIRCUIT COURT OF FAIRFAX COUNTY

Richard A. Robertson

v.

Fairfax County
Board of Supervisors et al.

July 3, 2002

Case No. (Chancery) 160618

BY JUDGE ARTHUR B. VIEREGG

The subject of this zoning case is an ordinance enacted by the Fairfax Board of Supervisors ("Board"), Fairfax County Zoning Ordinance, § 2-414 ("§ 2-414"). It prohibits the construction of residential dwellings within 200 feet of an interstate highway or the Dulles Airport Access Road ("DAAR"). However, it provides that the Board may approve exceptions to this residential development ban if an affected landowner submits proffers deemed acceptable to the Board. The focal issue framed by this case is the extent to which § 2-414 affords the Board discretion to disapprove a landowner's request for relief from its development ban.

*Preliminary Statement of the Case*

Complainant Robertson owns two parcels of land in Fairfax County that together comprise approximately 2.78 acres, Tax Map No. 40-1(1), parcels 10 and A1. The parcels are collectively referred to as the "Property." This cause

came before this Court for trial on April 29, 2002,[1] upon Robertson's amended petition for a declaration that the Board's denial of his application and associated proffers for relief from § 2-414's development ban[2] was arbitrary, capricious, and unreasonable.[3] After receiving the evidence presented and after hearing oral argument, I took the matter under advisement. I am now prepared to rule.

## I. *Material Facts*

### A. *Procedural History*

Robertson's property was zoned R3 before § 2-414 was enacted in August 1979. The R3 zoning classification permits the construction of up to three dwelling units per acre. The Property's lengthy southeastern boundary abuts the DAAR. Virtually all of the Property is located within 200 feet of the DAAR.

Pursuant to § 2-414, Robertson filed an application, *Compl. Ex. 2*, requesting the Board's permission to develop four residential lots on the Property. In his application, Robertson proposed proffers, including his commitment to employ noise reduction materials in the construction of the

---

[1] After two days of the trial, the trial was continued until May 20, 2002, to allow the parties to brief certain issues. Closing arguments were heard on May 20, 2002.

[2] It cannot be gainsaid that the sole reason for the rejection of the proffers was noise. Although citizens from the community opposing development cited other objections, noise was the sole reason cited by Supervisor Mendelsohn, *see Resp. Ex. 9*, and the only issue developed by the Board at trial.

[3] Before trial, the parties limited the issues to be tried. Pursuant to an agreed order entered by the Honorable David T. Stitt on July 27, 2001, the parties stipulated the issues to be tried as essentially being whether or not the denial of Robertson's applications and proffers were unreasonable, arbitrary, and capricious and had no rational relationship to a legitimate state purpose. The parties agreed that no constitutional issues were involved. In oral argument, Robertson argued that the enactment of § 2-414 imposing the 200-foot residential non-development zone constituted impermissible piece-meal zoning. This contention, relating as it did to the validity of the ordinance, as distinguished from the conduct of the Board *vis-a-vis* Robertson's proffers, was not framed by his pleadings. *See Ted Lansing Supply Co. v. Royal Aluminum and Constr. Corp.*, 221 Va. 1139, 1141, 277 S.E.2d 228 (1981), and was inconsistent with Judge Stitt's order narrowing the issues to ones relating to the propriety of the Board's denial of Robertson's application. Accordingly, I conclude that this issue is not properly before me for decision.

four dwellings. In addition to his written application and proffers, Robertson submitted a proposed plat depicting the placement of the four residential lots on the Property. *Compl. Ex. 1.* Upon receiving Robertson's application, the Board referred the matter to the County Staff for evaluation. The Staff reviewed the initial application and recommended its approval subject to the performance of the proffers Robertson had submitted. *Compl. Ex. 2.; Resp. Ex. 3.* Subsequently, the Board remanded the application to the Planning Commission for a recommendation. The Planning Commission recommended against the approval of the application for a variety of reasons, but principally because excessive noise would be generated by the nearby DAAR. The Board thereafter denied the application for the reasons cited by the Planning Commission. *Resp. Ex. 9.* Pursuant to § 15.2-2285(F) of the Code of Virginia, Robertson appealed to this Court, contending at trial that the Board's disapproval of his application was unreasonable, arbitrary, and capricious.

B. *Evidence at Trial*

At trial, Robertson called Mr. Peter Braham, a County Staff Planner, who testified that, historically, in working with § 2-414, the Staff and the County had only been concerned with the issue of highway noise. Mr. Kevin Miller, an acoustical engineer with knowledge of and experience in testing noise levels, testified on behalf of Robertson. Miller testified that noise is measured in terms of Ldn readings, and he described the nature of the tests conducted at the Property in 1997 over a continuous 24-hour period. Miller further testified that the tests disclosed the highest *exterior* Ldn sound levels[4] did not exceed the 65 Ldn noise level goal contained in the Fairfax County Comprehensive Plan ("Comprehensive Plan"). *Miller Test. on April 30, 2002, Tr.* at 41.

Miller also testified that trucks generate ten times the noise of cars; that busses generate far more noise than cars; and that busses and cars, but not trucks, are permitted by law to use the DAAR. *Id.* at 39-40. He testified that some people are more affected by highway noise than others; that experts expect that people are generally not impacted at Ldn levels of 65 and below; that they are moderately impacted at levels between 65 and 70 Ldn; and that they are "noticeably" impacted at noise levels of 75 Ldn or higher. *Id.* at 20-23. Miller also noted that traffic noise levels are greater when traffic is not extremely heavy, as

---

[4] Ldn noise level represents an average noise level, measured in decibels, a logarithmic scale, recorded over a continuous 24-hour period. However, nighttime readings are accorded greater weight in calculating an Ldn because human beings are more sensitive to noise in the nighttime hours.

during non-rush hour traffic, because vehicle engines generate higher speeds and hence, create more noise. *Id.* at 39. He testified that houses attenuate noise but conceded in cross-examination that no attenuating effect would accrue to a person in line of sight of a highway. *Id.* at 30-31.

In its case, the Board limited its evidence related to DAAR noise impacting the Property to the testimony of its own acoustical expert, Mr. Gary E. Ehrlich. Ehrlich testified (1) he had placed six sound meters on the property where backyards were indicated on the Robertson development plan; (2) the noise level testing was conducted in February 2002; (3) the sound meters disclosed average Ldn readings over various 24-hour periods of 65 Ldn or less at all times except for two meters during one of the 24-hour periods; and (4) it was his opinion, based on the DAAR traffic projections of the County's traffic engineer Mr. Robert Owolabi, that noise affecting the Property would reach three-day average noise levels at four of the six metered locations ranging from 65.5 Ldn to 66.8 Ldn by the year 2020.[5] *Ehrlich Test. on April 30, 2002, Tr.* at 16-20, 25-27.

In connection with his methodology, Ehrlich testified that his sound meters would record a reading of "what the sound level was every five minutes in terms of the average maximum and minimum and also a bunch of other numbers, and based on those five minute averages [he] was able to determine the hourly averages, and based on the whole series of hourly averages contained elsewhere in the report, [he] was able to calculate what the [Ldn] was over a 24 hour period." *Id.* at 17-18. Ehrlich further indicated that he started his meters at 6 p.m. on a Monday and ended at 3 p.m. the following Friday. He noted that he was therefore able to determine average 5-minute sound levels for (1) four 24-hour periods beginning from the start of the meter readings on Monday at 6 p.m.; and the (2) three 24-hour readings beginning at 12:01 a.m. on Tuesday, Wednesday, and Thursday. *Id.* at 17-18.

The Board introduced Ehrlich's report which demonstrated that for the 24-hour period beginning on Monday at 6 p.m. until 3 p.m. the following day, all of the average decibel readings were below 65 Ldn; that the Tuesday and Wednesday meter readings reflected no averaged readings over 65 Ldn; that the Thursday meter readings reflected three averaged meter readings exceeding 65 Ldn; and that all the 6 p.m. Thursday to 3 p.m. Friday meter readings exceeded 65 Ldn, the highest by 2.3 Ldn. *Resp. Ex. 39.*

---

[5] Mr. Ehrlich concluded that in 2010, the average noise levels at three metered locations would be 65.6; 66.4, and 66.1, the others would fall at or below 65 Ldn.

On cross-examination, Ehrlich testified that the 65 Ldn level is one contained in the Comprehensive Plan. He conceded that while the Comprehensive Plan refers to one 24-hour Ldn noise level, his report did not contain such a 24-hour figure but rather a collection of ranges of figures. *Ehrlich Test. on April 30, 2002, Tr.* at 30. When asked whether his methodology was "what was commonly done" to measure current noise levels, Ehrlich responded:

> The reason that I don't usually present a single number for my measured data is because I present a single number for the model data. Typically, the way I do a noise study is that I use measurements solely to calibrate a model. Then I use the model figure off the projected noise level.
>
> So in this case, I did not do that because I was comparing what Miller Henning Associates had done to my study. But, if I had done the study on my own, I would have done projections using the traffic noise model.

*Id.* at 31. Ehrlich did not answer the question asked, apparently because he believed Robertson's counsel was referring to *future* noise projections. However, in follow-up questions, Ehrlich indicated that he believed that existing noise evaluated in terms of the Comprehensive Plan's single Ldn figure would refer to the highest reading recorded in a continuous 24-hour period. *Id.* at 32-33.

The following colloquy is to the same effect:

> Q. Now, so we can finish this line of questioning, you cannot give the Court a single number that you will state is the Ldn for Location M-1?
>
> A. The closest I can give to a single number for the existing would be up to 65.2.
>
> Q. Well, how about doing it in my more positive and optimistic way, down to 61.5?
>
> A. Well, as engineers, we usually consider somewhat of a worst case, so we don't usually look at the best case. Even if I'm working for a developer I don't look at the best case.

*Ehrlich Test. on April 30, 2002, Tr.* at 35.

Later, he indicated that the Ldn standard was based on an average taken over a 24-hour period. *Id.* at 52. When asked to demonstrate where the industry standard was stated as being an average of measurements taken at intervals, as opposed to noise measured continuously over a 24-hour period, Ehrlich indicated he had never seen it reduced to writing. *Ehrlich Test. on April 30, 2002, Tr.* at 37. Instead, he indicated that the standard was "to focus on the loudest day that you measured for." Ehrlich later conceded that there was no appreciable difference in Miller's overall Ldn reading and his readings. *Id.* at 41. Ehrlich testified, consistently with Miller, that human beings could not distinguish the difference in noise levels of less than 3 decibels. *Id.* at 38.

As to future noise projections on the Property, Ehrlich indicated that he had asked the County for traffic projections for traffic volume in both directions in front of the Property. *Id.* at 38. He further indicated that, based on the Miller firm's noise report and his own study, there was no basis for assuming that Property Ldn levels had risen due to DAAR traffic noise in the preceding five years. *Id.* at 46. Ehrlich did not dispute that interior noise in the houses to be constructed, as set forth on the Robertson development plan, would not encounter excess noise in the foreseeable future in view of Robertson's proffer that noise mitigating materials would be used to construct the dwellings. *Ehrlich Test. on April 30, 2002.*

Mr. Owolabi, the County's traffic engineer, testified as to how he had prepared the traffic forecast for the Property relied upon by Ehrlich:

> There are various ways to develop traffic forecasts, and, primarily, the two predominant factors are the utility of output and the turnaround time for a forecast. In this particular case, I used available information as follows.
>
> I used historical records of average daily traffic in the county. I also used engineering judgment, of course. I used land use recommendations in the Comprehensive Plan. And based on the combination of that, the other factor was demographic projections; the regional projections specific for this area of the subject site. And then we developed what is called the growth rate resulting from that, and then the growth rate was the mean factor used in growing the base year traffic, which is the Year 2000 traffic, to the future years required for the project.

*Owolabi Test. on April 30, 2002, Tr.* at 57.

Owolabi testified that in developing his forecast, he identified the Property on a tax map; reviewed Robertson's development plan for the Property; visited the Property; and reviewed "relevant elements of the Comprehensive Plan related to the subject site." *Id.* at 58-59. Owolabi did not, however, define the "relevant elements relied upon."

Owolabi opined that based on his methodology, a three-percent increase in DAAR traffic would occur between 2000 and 2010 in accordance with projections indicated on a chart introduced into evidence. *Resp. Ex. 40.* He emphasized that his three-percent figure was based upon the 1995 Comprehensive Plan review and that the evaluation process indicated the average growth rate for "roadway arterials," such as the DAAR, would increase at an average rate of three-percent per year. *Owolabi Test. on April 30, 2002, Tr.* at 60-62.[6]

In connection with *Resp. Ex. 40*, Owolabi explained that the first figure for traffic-volume on the chart for the year 2000 was 75,000 vehicles, a VDOT figure indicating the number of vehicles passing by the Property. *Id.* at 60. Based on that baseline, Owolabi then projected traffic increases based on the assumed average three-percent growth rate for the years 2000 through 2010. Because an average vehicle volume figure can be evaluated for only a reasonable period of time, Owolabi stated that he used a two-percent vehicular growth rate for the 2010 to 2020 time period. He testified as to his projected growth rates:

> [W]e assumed [a] three-percent average rate for a reasonable period of time. It is reasonable to assume that a steady growth rate may occur within a five to ten year period. That is why we used three percent from 2000 to 2010.
>
> But beyond that period, it is conventional for us to look at the specific environment for which the forecast is required, and that includes looking at the level of development in the area, looking at the recommendations — land use recommendations in the

---

[6] While portions of the Comprehensive Plans for 1983 and 1984 were received into evidence, as was a portion of the 1990 Comprehensive Plan (pp. 88-89), as Respondent's Ex. 49, Ex. 50, and Ex. 11 respectively, no Comprehensive Plan for 1995, nor a 1995 Comprehensive Plan update, were offered or received into evidence. The three-percent traffic volume increase referred to by Owolabi is not mentioned in the 1983, 1984, or 1990 Comprehensive Plan excerpts that were introduced into evidence.

Comprehensive Plan to determine how much growth could occur in the area, and, of course, the regional demographic projections.

There is a limit to which the Washington metropolitan area could grow within the next 20-25 years. And based on those factors and using engineering judgment, we determine what is a reasonable growth rate beyond a ten-year period. And in this instance, we determined that a reasonable growth rate would be two percent beyond 2010 and 2020.

*Owolabi Test. on April 30, 2002, Tr.* at 61.

Although the Property is located outside Interstate 495, otherwise known as the Washington Beltway, in the course of cross-examination, Owolabi noted that the VDOT figures used were for cars on the DAAR *inside* the Beltway. *Id.* at 64-65. Owolabi also testified that he did not know how the VDOT figures had been compiled, that is, by actual car count, projection, or some other methodology. Owolabi was asked whether the traffic volumes were higher or lower *outside* the Beltway, and he ultimately conceded that he could not answer that question. *Id.* at 65-71.

## II. *Analysis and Decision*

In order to frame the issues dispositive of this zoning dispute, it is necessary to first interpret § 2-414; then to review the applicable standards of review for legislative actions such as the zoning decision under consideration; and finally to determine whether or not Robertson sustained his ultimate burden of proving that the Board's legislative action was unreasonable, arbitrary, and capricious.

## A. *Interpretation of § 2-414*

The Ordinance is entitled "Yard Regulations for Lots Abutting Certain Principal Arterial Highways and Railroad Tracks," and states in pertinent part:

1. Notwithstanding any other provision of this Ordinance, the following minimum distances shall be maintained between the principal buildings and right(s)-of-way of interstate highways and the Dulles Airport Access Road:
A. All residential buildings — 200 feet.
B. All commercial and industrial buildings — 75 feet.

2. [applicable only to land near railroad tracks]

3. Deviations from the provisions of Par. 1 and 2 above may be permitted with Board of Supervisors' approval of appropriate proffered conditions, if it finds that such deviations will further the intent of the Ordinance, adopted comprehensive plan, or other adopted policies.

4. The provisions of Par. 1 and 2 shall not apply to those instances where a lot has been recorded prior to the effective date of this Ordinance where the enforcement of this regulation would negate the use of the lot in accordance with the provisions of the zoning district in which located.

In accordance with well-accepted rules of statutory construction, the language adopted by a legislative branch in enacting a law must be accorded its plain meaning unless such an interpretation would result in a strained or tortured result. *Vollin v. Arlington County Electoral Bd.*, 216 Va. 674, 679, 222 S.E.2d 793 (1976). Here, it is plain that the Board enacted § 2-414(1) to prohibit any and all residential development within 200 feet of the DAAR: "*Notwithstanding any other provisions of [the Fairfax County Zoning Ordinance]*, the following minimum distances *shall be maintained* between principal buildings and .... the Dulles Airport Access Road." (Emphasis added.) Given the mandatory directive of the ordinance, the ban expressly applies to all properties within 200 feet of the DAAR irrespective of the zoning classification of that property, unless other provisions of § 2-414 require a different interpretation. Two provisions, specifically §§ 2-414(3) and (4), however, contain language indicating that under certain circumstances § 2-414(1)'s ban may be deemed inapplicable.

### 1. § 2-414(3)

Both parties concede that it is necessary for a landowner seeking relief from § 2-414's development ban to apply for a deviation with proffered noise abatement conditions. Section 2-414(3) expressly authorizes the Board to approve deviations from the ban, if appropriate conditions are proffered that will "further the intent of the Ordinance, adopted Comprehensive Plan, or other adopted policies." The evidence presented demonstrated that, in codifying the residential development ban within 200 feet of the DAAR, the Board sought to protect future residents from excessive highway noise. The evidence also demonstrated that this highway noise was generally evaluated

with reference to the applicable Comprehensive Plan. The Board stressed it is not permitted to dictate proffers in return for favorable zoning decisions. *Rinker v. City of Fairfax*, 238 Va. 24, 381 S.E.2d 215 (1989). And accordingly, the Board could not indicate what proffered conditions might be accepted in advance of a deviation application.

Although Robertson filed a Proffered Conditions Amendment application that presupposed an *amendment* of prior approved conditions, although no prior conditions had theretofore been approved, both the Board and Robertson treated Robertson's PCA application as an application for a deviation pursuant to Va. Code § 2-414(3). *Cf.* Fairfax County, Va., Zoning Ordinance § 18-204.

### 2. § 2-414(4)

Section 2-414(4) expressly stipulates that the development ban contained in § 2-414(1) does not apply to situations where "a lot" has been recorded prior to the effective date of § 2-414, if the enforcement of § 2-414(4) "would negate the use of the *lot* in accordance with provisions of the zoning district in which the *lot* was located."[7] Ironically, both parties in this case argued that § 2-414(4) applied to the subject property, because the Property had been zoned R3 prior to the effective date of § 2-414.[8] Robertson argued, in effect, that § 2-414(1)'s development ban would preclude him from developing the Property in accordance with its R3 classification and hence the ban "negated" his R3 use of the Property. The Board argued that because the R3 zoning classification afforded Robertson the right to development *up to* three

---

[7] Section 20-300 of the Fairfax County Zoning Ordinance defines a lot as follows: "For the purpose of this Ordinance, a parcel of land that is designated at the time of application for a special permit, a special exception, a Building Permit, or Residential/Non-Residential Use Permit, as a tract all of which is to be used, developed, or built upon as a unit under single ownership. A parcel of land shall be deemed to be a lot in accordance with this definition, regardless of whether or not the boundaries thereof coincide with the boundaries of lots or parcels as shown on any map of record."

[8] The only evidence put forth by either party that suggested that this property may have been "a lot" came from Ms. Jane Gwinn, the Fairfax County Zoning Commissioner, who testified with respect to the buildability of the Robertson property. She initially stated that she treated the four proposed lots as subdivided lots, despite any evidence to support that conclusion. Gwinn then changed her testimony and stated that the she considered the entire Robertson parcel to be a lot. This Court does not give significant weight to such confused testimony although such testimony was entitled to, and received, careful consideration.

residential units per acre, and because Robertson had a *right* to develop one unit per acre (a premise that was incorporated in a stipulation of the parties, discussed *infra*), that the Board had discretion to approve only one unit on the entirety of Robertson's 2.78 acre tract such that "this regulation" would not therefore negate Robertson's use of the Property.

In an opinion letter issued on May 14, 2002, I ruled that § 2-414(4) did not apply to the Property. I reasoned that the express terms of § 2-414(4) pertained only to "a lot," a term that is defined by the County's own zoning ordinance as a "parcel of land designated at the time of application for a special use permit, a special exception, a Building Permit, or Residential/Non-Residential Use Permit, as a tract all of which is to be used, developed, or built upon as a unit under common ownership." Fairfax County, Va., Zoning Ordinance § 20-300. I ruled that, because the Robertson Property was not the subject of an application for a special use permit, a special exception, a Building Permit, etc., it was therefore not a lot as defined by § 20-300. *See*, Opinion Letter of May 14, 2002.

Assuming *arguendo*, however, that § 2-414(4) is applicable to this case, I conclude that the Board's argument — that Robertson was entitled *as a matter of right* to develop one unit on the Property — is flawed. If § 2-414(4) is applicable to the Property, its language vitiates the § 2-414(1) development ban: "the provisions of Par. 1 *shall not apply* .... where a lot has been recorded prior to the effective date of this Ordinance where the enforcement of this regulation would negate the use of the lot in accordance with the provisions of the zoning district in which it is located." (Emphasis added.) The Board implicitly argued that § 2-414 accorded it discretion not only to approve proffered conditions for permitting residential development on land, but discretion to dictate the number of houses which might be constructed, irrespective of whether the number of houses to be built had any rational relationship to sound levels generated by interstate highways or the DAAR.

In support of its argument that Robertson was entitled to develop one residential unit irrespective of § 2-414(1)'s comprehensive development ban, the Board referred this Court to a series of Virginia Supreme Court decisions in which landowners had unsuccessfully petitioned governing bodies to rezone property from a lower density zoning district to a higher one. In each, the Virginia Supreme Court sustained the local governing body's denial of the requested rezoning, emphasizing that a zoning decision is legislative in nature and that a denial of a rezoning petition will be upheld if the use permitted by the existing zoning is reasonable. *Board v. Miller & Smith*, 242 Va. 382, 410 S.E.2d 648 (1991); *Board v. International Funeral Services, Inc.*, 221 Va.

840, 275 S.E.2d 586 (1981); *Board of Supervisors v. Jackson*, 221 Va. 328, 269 S.E.2d 381 (1980). Those decisions, however, are distinguishable. Here, the Fairfax Board of Supervisors had heretofore determined that three units per acre was a reasonable use of the Property, and Robertson merely pursued his right to develop his land in accordance with that existing zoning classification. In subsequently enacting § 2-414, the Board superimposed what Robertson's attorney has accurately portrayed as a "noise overlay district" on the Property. In essence, the Board effectively downzoned the property by banning all residential development because of the impact of noise from the DAAR.

While it is well established that a zoning ordinance can effect a Fifth Amendment taking, such a confiscatory effect might be permissible where public safety, public health, or general welfare are valid concerns. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 120 L. Ed. 2d 798, 112 S. Ct. 2886 (1992); *Agins v. City of Tiburon*, 447 U.S. 225 (1980) (citations omitted). It is reasonably plain that the Board's hypothesis of Robertson's vested right to build one dwelling unit on the Property was related to Fifth Amendment "taking" considerations. *See Resp. Ex. 9.*

Furthermore, the Board neither proffered nor introduced evidence indicating that four dwellings within 200 feet of the DAAR was inconsistent with public health, safety, and general welfare, while one such dwelling did not implicate such considerations. While downzoning may be proper to address valid police power considerations, including arguably noise, such concerns do not logically invest the governing body with *carte blanche* authority to divest property rights for reasons unrelated to those concerns for which the downzoning was effectuated.

As previously indicated, the parties agreed that this case was limited to whether or not the Board's denial of Robertson's application was unreasonable, arbitrary, and capricious. As was also previously discussed, Robertson did not plead a piecemeal downzoning case, and, therefore, I have not addressed the validity of § 2-414 in that regard. However, the Board's position that, pursuant to § 2-414(3), it had the discretion to permit as few as one dwelling unit on the entirety of the 2.78 acres, zoned R3, and that the Board could do so for reasons unrelated to the health, safety, and welfare of the community demonstrates that the Board's application of the statute is in-fact impermissible piecemeal downzoning. *See Fairfax County v. Snell Corp.*, 214 Va 655 (1974). On its face, § 2-414 purports to address all properties located within 200 feet of interstate highways or the DAAR. However, the Board argued that it has unlimited discretion in permitting the development of any number of dwellings otherwise authorized in particular zoning districts.

Through the proffer mechanism in § 2-414(3), the Board's discretion targets a *particular* property, thus effectuating the undesirable effect of piecemeal downzoning. This conclusion is inescapable given the Board's failure to produce any evidence demonstrating a rationale for their willingness to subject one household to the purported noise problems for which § 2-414 was enacted and their unwillingness to subject four households to it.

For the foregoing reasons, I conclude that the Board's contention that "this regulation," § 2-414(1), did not negate Robertson's use of the Property is a misreading of its own ordinance. The Board, however, further argues that the parties entered into a stipulation that Robertson had a right to develop one residential unit on the Property, and in effect, that Robertson had conceded that § 2-414(1) did not negate his use of the Property. The stipulation, however, is plainly one that involves a question of law, specifically, the interpretation of § 2-414.[9] I respectfully conclude that while courts are generally bound by the parties' stipulations of fact, issues of law are the province of the courts, not the province of the parties, and accordingly courts are not bound to accept as controlling stipulations as to questions of law. *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 61 L. Ed. 722, 37 S. Ct. 287-90 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative, since the court cannot be controlled by agreement of counsel on a subsidiary question of law...."). *See also, United States Nat'l Bank v. Independent Ins. Agents of Am.*, 508 U.S. 439, 413 (1993) ("After giving the parties ample opportunity to address the issue, the Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law."); *Betts v. Rector and Visitors of University of Virginia*, 113 F. Supp. 2d 970 (W.D. Va. 2000) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law) (citing *United States Nat'l Bank* (citation omitted)); *Howard v. Ward County*, 418 F. Supp. 494 (N.W. N.D. 1976) ("while a stipulation of material facts is ordinarily proper ... a ... court is 'not

---

[9] In connection with this issue, the Board relied on *Southeastern Tidewater Area Manpower Auth. v. Coley*, 221 Va. 859 (1981), in which the Supreme Court of Virginia enforced a stipulation that there was no master-servant relationship under the facts of the case. The Court stated "we do not agree with the Industrial Commission that this stipulation of *fact* may be disregarded." *Coley*, 221 Va. at 862 (emphasis added). *Coley* is distinguishable on the ground that the Court plainly treated the stipulation as one of fact and not one of law.

... obliged to accept, as absolutely controlling, a stipulation of the parties as to a question of law or a mixed question of law and fact'.") (citing *Spangler v. Pasadena City Board of Educ.*, 519 F.2d 430, 434-35, n. 4 (9th Cir. 1975)); *Snider v. Snider*, 199 F.3d 108, 113 (1999) ("The court cannot properly determine a question of law on the basis of a party's concession. ... The meaning of a statute, for example, cannot vary from case to case depending on concessions a party may have made."). The citations for all supporting law are too numerous to list. Further authority may be found in the *Eleventh Decennial Digest*, 51 11th D. Pt. 1, Note 3, pp. 233-35.

Based on the foregoing interpretation of §§ 2-414(1), (3), and (4), I conclude that the decisive issue in this case is limited to whether or not the Board's denial of Robertson's application for relief from § 2-414(1) was unreasonable, arbitrary, and capricious.

B. *Standard of Review*

Legislative zoning decisions of a governing body are presumed reasonable and valid. However, a Court may reverse such a decision if it is found to be arbitrary, capricious, and unreasonable. *See Board of Supervisors v. McDonald's Corp.*, 261 Va. 583, 589, 544 S.E.2d 334-90 (2001); *Board of Supervisors v. Jackson*, 221 Va. 328, 333 (1980). To demonstrate that a zoning decision is unreasonable, a landowner must prove that the use he requests is reasonable and also that the uses allowed under the existing zoning are unreasonable. *See City Council v. Harrell*, 236 Va. 99, 102, 372 S.E.2d 139 (1988); *Board of Supervisors v. International Funeral Servs., Inc.*, 221 Va. 840, 843 (1981). If the landowner introduces evidence demonstrating that his requested use is reasonable and the existing zoning is unreasonable, the Board must produce evidence sufficient to make the issue decided "fairly debatable." *Southland Corp.* at 522-23; *McDonald's Corp.* 261 Va. at 590. An issue is fairly debatable if, "when measured by quantitative and qualitative tests, the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *City Council of Salem v. Wendy's*, 252 Va. 12, 15, 471 S.E.2d 469 (1996). Such evidence must be "evidence which is not only substantial but relevant and material as well." *Fairfax County v. Williams*, 216 Va. 49, 58 (1975). If the reasonableness of the legislative action is fairly debatable, the reviewing court will not substitute its judgment for that of the legislative body and the legislation at issue will be upheld. *Loudoun Co. v. Lerner*, 221 Va. 30, 34 (1980).

## C. *Decision*

Both Robertson and the Board, by their counsel, agree that consideration of and the eventual rejection by the Board of Robertson's proffers was a zoning decision. In order to evaluate the propriety of the Board's disapproval of Robertson's application, it is first necessary to identify the existing zoning and the proposed use of the Property. Although zoned R3, on account of § 2-414's development ban, the Property could not be developed, as nearly the entire parcel falls within 200 feet of the DAAR. By his application, Robertson sought permission to develop four dwellings, several fewer than the eight dwellings the R3 zoning classification might optimally support. At best, therefore, the Board's decision that four dwelling units could not be developed enjoyed a presumption of reasonableness and validity. Robertson bore the burden of demonstrating that the Board's denial of his application for relief from the § 2-414's total ban was unreasonable. At trial, this Court denied all but one of the Board's grounds for its motion to strike Robertson's evidence. That remaining motion is also denied. Robertson was additionally required to demonstrate that his proposed development of the Property was reasonable. If Robertson sustained his two-pronged burden, the Board then bore the burden to demonstrate that the issue of whether to deny or accept Robertson's application and proffers was fairly debatable.

Although evidence was adduced at trial regarding both interior noise (DAAR noise encountered by persons inside the houses to be built) and exterior noise (DAAR noise encountered in yards outside those houses), interior noise was not a disputed issue. Robertson's acoustic expert, Mr. Miller, testified that Robertson's proffer would reduce interior noise below problematic levels. That testimony was not contradicted by the Board's expert, Mr. Ehrlich. Therefore, Robertson's threshold twin burdens were to prove that DAAR *exterior* noise affecting the Property was not problematic, and, therefore, the Board's denial of his application on that basis was unreasonable.

### 1. *Was Robertson's Proposed Use Reasonable and Was the Board's Rejection Unreasonable?*

I find that Robertson bore the twin burden of proving his proffered use of the property was reasonable and the Board's rejection of his application was unreasonable. The two prongs of his burden are evaluated together because the unreasonableness of the Board's denial of Robertson's application and the reasonableness of his proposed use each depend on the noise impact of the

DAAR on the Property. Moreover, Miller testified that, based on sound tests conducted in 1997, the exterior DAAR highway noise on the Property was generally below and sometimes equal to the 65 Ldn level in the Comprehensive Plan. The Ldn sound levels testified to by Miller were based on readings of all sound recorded in a continuous 24-hour period, which Miller testified and which I find, was the standard required by the Comprehensive Plan.[10] Accordingly, Robertson sustained his burden of demonstrating that present noise levels on the Property were not problematic.

At trial, Robertson adduced no evidence as to *future* exterior noise produced by the DAAR. The Board argues that Robertson's failure to produce such evidence made the rejection of Robertson's application reasonable. This argument, however, fails for two reasons. First, the Board presented no evidence which suggested that either the Comprehensive Plan or the Board required a future noise study to be submitted with the proffers pursuant to a § 2-414(3) application for deviation from the development plan. Additionally, a review of the three public hearings held concerning Robertson's application also fails to reveal any concerns over the lack of a noise study addressing future noise on the Property. *Resp. Exs. 7, 8, 9.* Second, while Ehrlich indicated that the report compiled by the Miller firm was not a noise study "conforming to industry practice," because it did not contain future noise projections, *Ehrlich Test. on April 30, 2002, Tr.* at 26-27, Ehrlich failed to provide the basis for this opinion. Furthermore, by virtue of the numerous shortcomings in Ehrlich's expert testimony, I do not find his unsupported opinion in this regard persuasive. I conclude, therefore, Robertson was not required to produce such evidence of future noise levels on the Property to meet his aforementioned two-pronged burden.

For the foregoing reasons, I find that Robertson met his burden of demonstrating both that noise on the Property was not a valid basis for the Board's denial of his application and that his proposed use of the Property was reasonable.

---

[10] Additionally, because the development of four units on the 2.78-acre property was otherwise permitted by its R3 zoning designation and because Robertson's development plan had been recommended by the County Staff, *Resp. Ex. 3,* reasonableness of his application, *vis-a-vis* present noise levels, was also demonstrated.

2. *Did the Board Produce Evidence Sufficient to Make the Question "Fairly Debatable?"*

Because Robertson met his two-pronged burden of proof, the Board then bore the burden of producing evidence establishing that the approval or rejection of Robertson's application was fairly debatable, such that this Court was bound to honor its exercise of legislative discretion. I find that the Board failed to sustain that burden.

As previously noted, the pivotal dispute at trial was excessive exterior noise produced by the DAAR. The Board's core position supporting its denial of the construction of four houses on 2.78 acres of land zoned R3 was based on evidence regarding present and future noise impacting the Property. It sought to show (1) that present noise levels exceed the 65 Ldn threshold of problematic noise; and (2) the likelihood that future noise levels would likely exceed 65 Ldn. These positions depended upon the testimony of its expert, Mr. Ehrlich, who in turn relied upon traffic analyses of County traffic engineer, Mr. Owolabi.

a. *Present Noise*

As to present noise, the issue becomes whether Ehrlich's opinion that the DAAR generated present noise levels in excess of 65 Ldn satisfied the aforementioned quantitative and qualitative standard necessary to persuade a reasonable or objective person that its decision was fairly debatable. In his report, Ehrlich opined that existing noise levels exceeded 65 Ldn. *Resp. Ex. 39.* To evaluate his opinion, however, one must first address whether his methodology was consistent with measuring sound levels in accordance with the Comprehensive Plan. In his testimony, Ehrlich conceded that he had not measured noise on the Property for a continuous 24-hour period. Instead, he measured present external noise at 5-minute increments and then averaged the readings obtained. Miller credibly testified that acoustical engineering practice and the Comprehensive Plan required continuous, 24-hour noise monitoring. Ehrlich's testimony, when challenged, was equivocal. I therefore conclude that Ehrlich's methodology was flawed.

Based on the fact that in its Comprehensive Plan, the County adopted a standard that required one Ldn figure, and after considering the testimony of both experts and the reasons for their opinions, I find that Ehrlich's opinions as to present external noise levels on the Property were not conduced in a manner consistent with either the Comprehensive Plan and/or acoustical

engineering practices. Furthermore, based on Ehrlich's concessions that noise levels had not increased since the 1997 Miller firm study, I find that the Board failed to demonstrate that those levels had increased in the five years since the 1997 Miller firm tests. Accordingly, based on the evidence presented with respect to *present* noise levels, I find that the Board failed to satisfy its burden of producing qualitative and quantitative evidence establishing that the denial of Robertson's application was a fairly debatable issue.

b. *Future Noise*

The Board's principal argument in support of the Board's denial of Robertson's application was that Robertson had introduced no acoustical evidence with regard to future noise levels that would impact the Property as a consequence of the proximity of the DAAR. The Board further contended that Ehrlich's uncontested opinion that noise would increase in the future and surpass the 65 Ldn levels at least satisfied the Board's fairly debatable burden. While I agree with the Board's legal analysis, I find it failed to satisfy its burden of demonstrating that its expert testimony as to future noise had a sound factual foundation. I, therefore, find that the Board failed to satisfy its burden that future noise made its denial of Robertson's application a fairly debatable issue.

Ehrlich's opinions as to future noise were fundamentally flawed for two reasons. First, Ehrlich's opinions were based on readings, which, as discussed above, did not measure the noise on the Property so as to obtain an average 24-hour Ldn noise level as required by the Comprehensive Plan. Second, Ehrlich's opinions as to future sound levels depended on fatally flawed projections of future traffic increases prepared by County traffic engineer, Mr. Owolabi.

Owolabi's projections were not based on DAAR traffic volumes adjacent to the Property, but rather on VDOT traffic data collected for a stretch of the DAAR inside the Washington Beltway. When deposed as to the effect of traffic flow of a major circumferential highway between the source of his data and the subject property, Owolabi was unable to afford any credible explanation why the use of such data was appropriate. The unsoundness of Owolabi's projections was further underscored by other suspect assumptions. Owolabi testified, in essence, that he had not only taken VDOT figures for the portion of the DAAR from Route 123 to the Beltway (and not in the immediate vicinity of the Property), but that he had also simply assumed that

traffic would increase at the rate of three percent per year. *Owolabi Test. on April 30, 2002, Tr.* at 63-65.

But, Owolabi neither testified to traffic volumes on the Route 123 to Beltway segment between 1995 and 2000 in support of his three percent traffic growth projections, nor did he evince any understanding of how the three percent figure had been arrived at in the 1995 Comprehensive Plan review. Owolabi testified that, once derived, traffic projections are only reliable for "a reasonable period" of time, which, without further explanation, he testified as being ten years. *Id.* at 60-62. This testimony further undermined the credibility of Owolabi's traffic projections that in turn became the foundation for Ehrlich's opinions. If the three percent traffic growth projection was only good for ten years and was predicated on a traffic growth rate calculated in 1995, seven years of the ten-year "reasonable period" had elapsed by the time of trial. Furthermore, Ehrlich had opined that the DAAR traffic noise at the Property had not appreciably increased since the Miller firm's sound study in 1997. Therefore, Owolabi's assumption that traffic had increased at a three percent rate between 1997 and 2002 was, at best, highly suspect. Moreover, Owolabi opined that traffic in the vicinity of the Property would nevertheless increase on a three percent year-over-year basis through 2010, despite his testimony that such a projection would be reasonable for only ten years after it had been derived in 1995, thus making the projection accurate only through 2005.

After considering the foregoing circumstances, I conclude that the Board's case is based on expert testimony, which was neither credible nor "based upon facts within [its experts'] own knowledge nor established by other evidence" and accordingly I find that that it "possesses no evidentiary value." *Gilbert v. Summers*, 240 Va. 155, 160, 393 S.E.2d 213 (1990); *and see Street v. Street*, 25 Va. App. 380, 387, 488 S.E.2d 665 (1997) (fact finder not required to accept the testimony of an expert witness simply because he has qualified as an expert).

I, therefore, conclude the Board has not provided probative evidence demonstrating that DAAR noise levels at the Property are presently problematic and that it further failed to demonstrate by probative evidence that noise levels will be problematic in the future. Accordingly, the Board has not satisfied its burden of demonstrating that its rejection of Robertson's application was fairly debatable. In reaching this decision, I recognize that the fairly debatable standard for the Board is a low one. Nevertheless, as discussed, the Virginia Supreme Court has held a governing body has a burden to demonstrate that its zoning decisions are based on more than mere

plausibility or surmisal. The governing body must introduce qualitative and quantitative evidence to establish that there is a factual foundation for its action. I conclude that the Board failed to satisfy that burden of proof in the trial of this case.

## Conclusion

For the reasons expressed, this case is remanded to the Board of Supervisors with directions to reconsider Mr. Robertson's application and to act on it in a manner not inconsistent with this opinion.